Eastern District of Kentucky
**FILED**

OCT 1 2 2018

AT ASHLAND
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## ASHLAND

**Civil Action No. 17-68-HRW**

**APRIL PALMER,**                                         **PLAINTIFF,**

**v.**              **MEMORANDUM OPINION AND ORDER**

**MARATHON PETROLEUM COMPANY, LP,**             **DEFENDANT.**

This matter is before the Court upon Defendant Marathon Petroleum Company, LP's Motion for Summary Judgment [Docket No. 28]. The matter has been fully briefed by the parties [Docket Nos. 28-1, 31 and 43]. For the reasons set forth herein, the Court finds that Defendant is entitled to judgment as a matter of law.

### I.

This case arises from the termination of Plaintiff April Palmer's employment at Marathon Petroleum Company, LP ("MPC").

The facts are, for the most part, undisputed. Indeed, Plaintiff provides very little in the way of factual recitation in her response to Defendant's dispositive motion and accompanying affidavit. The salient factual disputes are noted below.

**A.**     **2011**

In February 2011, MPC hired Ms. Palmer to work as a Training Specialist at its Marine Transportation Division ("Marine") in Catlettsburg, Kentucky. [Docket No. 29-6, Deposition of April Palmer, p. 36-37].

According to MPC, Training Specialists facilitate training for different divisions, or client

groups, within Marine. [*Id.* at p. 37- 38]. Specifically, they are responsible for determining the training needs of a given client group, finding vendors to supply an appropriate training program, and vetting those vendors to determine whether the program meets the client's specific needs. *Id.* Once the Training Specialist finds an appropriate training program, she must schedule and oversee the training session, ensure that appropriate resources are provided during the session, and document who attended. [*Id.*]. Training Specialists must be able to work independently, with limited assistance and oversight from others, and manage several projects at once. [Docket No. 27-7, Affidavit of Kathy Brown, ¶ 5].

When Ms. Palmer was hired, the Training Department consisted of Supervisor Terri Rufus and Training Specialist Mandy Casto. [Docket No. 29-6. at pp. 38 - 40]. Client groups were divided into two categories—Maintenance and Boat Operations. *Id.* Ms. Palmer was generally responsible for the Maintenance groups, while Ms. Casto handled the Boat Operations groups. *Id.*

Ms. Palmer signed an Employee Agreement, which stated that "employment is at will, and terminable at any time for any reason not otherwise prohibited by law. *Id.* at p. 35 -36. According to Ms. Palmer, MPC was aware that she suffered from ADHD, Chron's disease and fibromyalgia. *Id.* at p. 34.

Like most companies, MPC has an annual performance review process for employees. *Id.* at p. 115. Goals are set for each employee at the beginning of each year. *Id.* The employee and their supervisor evaluate the employee's performance, based, at least in part, on their success in achieving the aforementioned goals by the end of the year. *Id.* Both the employee and his or her supervisor document their evaluations in a Performance Development Workbook. The

2

employee's Performance Competencies are ranked on a scale of 1 through 5, with 1 representing superior performance and 5 representing the opposite. [Docket No. 29-8, 2011 Performance Development Workbook].

Ms. Rufus completed one such Workbook at the end of 2011. *Id.* Ms. Palmer received an average rating of 3 for all of the Competencies except "Collaboration," for which she earned a slightly better score of 2. *Id.* However, some of Ms. Rufus's comments suggested that Ms. Palmer had problems with time management and organization. For example, she suggested that Ms. Palmer improve her email communications and "focus on communicating the 'whys' when requesting information from others." *Id.* She also indicated that Ms. Palmer spent more time with client group members than her actual projects required and reminded her to balance her time. *Id.* Finally, Ms. Rufus noted that Ms. Palmer had set goals for 2012, including "personal development in time management and organization," which "should help her prioritize work and complete it in a timely manner." *Id.*

**B.    2012**

Ms. Rufus left the Training Department in 2012. [Docket No. 29-6, p. 40-41]. Shortly thereafter, MPC reorganized the Training Department, bringing it under the purview of the Human Resources Department and Human Resources Manager Chet Smith. *Id.* Accordingly, Mr. Smith completed Ms. Palmer's 2012 Performance Development Workbook. [Docket No. 29-9, 2012 Performance Development Workbook]. Ms. Palmer again received average ratings for all of the Performance Competencies except "Diversity Orientation," for which she earned a slightly better rating of 2. *Id.* Mr. Smith stated that Ms. Palmer still needed to improve her communications and work on meeting the needs of client groups. *Id.*

3

He noted:

> April should continue to work on improving all of our training
> functions such as organizing information and tracking & crediting
> training participation. April is professional with her
> communications but her message can sometimes be lost in the
> communications. She should focus on being more concise in her
> communications.

*Id.*

## C. 2013

In 2013, Ms. Palmer requested intermittent FMLA leave in connection with her Crohn's
disease. [Docket No. 29-10]. MPC approved her request. *Id.* Unfortunately, her condition
worsened; she underwent surgery in July 2013. [Docket No., 26-6, p. 135]. Although she sought
continuous FMLA leave for this surgery, MPC did not receive the completed Certification from
her surgeon until after the procedure. *Id.* Nonetheless, MPC officially designated the 6 to 8
week period following Ms. Palmer's surgery as FMLA-protected leave. [Docket No. 29-11].

In September 2013, Ms. Palmer's surgeon, Harry Reynolds, M.D., determined that she
could work from home on an as-tolerated basis. [Docket No. 29-6, p. 141]. A month later, he
cleared her for full-time work, with the sole restriction that she may need to get up often. [Docket
No. 29-12, Dr. Reynold's note]. Despite Dr. Reynolds' release to full-time work, MPC
implemented a Transitional Duty Program for Ms. Palmer so as to ease her back into work.
[Docket No. 29-13, Transitional Duty Agreement].

While Ms. Palmer was on leave, Kathy Brown was hired as the Training Supervisor for
the Training Department. [Docket No. 29-6, p. 41]. Ms. Brown completed Ms. Palmer's 2013
Performance Development Workbook, with some input from Mr. Smith. [Docket No. 29-14,

4

2013 Performance Development Workbook]. Ms. Palmer received an average rating of 3 for

three of the Performance Competencies and a below average rating of 4 for the other four

Competencies. *Id.* Ms. Palmer received an Overall Rating of 4, indicating that she "[g]enerally

meets performance expectations in some behaviors listed for each competency but has significant

need for development in many of the behaviors." *Id.* Specifically, Ms. Brown noted that Ms.

Palmer "needs to take more ownership of prioritization within a project," become more "self-

reliant," and "work on her planning skills to be able to plan a project." *Id.*

Ms. Brown observed:

> There were areas of April's performance that fell short of
> expectations in 2013. These were discussed with April in the fourth
> quarter of 2013 and have been noted throughout this workbook. It
> will be unacceptable to maintain the same level of performance in
> 2014.

*Id.*

In response to these comments, Ms. Palmer stated that her "performance was adversely

affected by the barriers of a medical crisis." *Id.*

**D. 2014**

Ms. Palmer states that, in January 2014, she discovered that the criticism in her 2013

performance review was based upon incorrect data entries made not by Ms. Palmer, but by the

temporary employee assigned to her position while she was on leave. [Docket No. 29-6, p. 148].

She contends that she explained this to Ms. Brown. *Id.* at p. 131. However, MPC denies

receiving any documents which would purport to substantiate her claim; nor has MPC been

provided any evidence in this regard during the pendency of this lawsuit.

5

In 2014, Ms. Palmer again took intermittent and continuous FMLA leave for her Crohn's disease. [Docket No. 29-15].

On August 4, 2014, Ms. Palmer had a mid-year review discussion with Ms. Brown, during which she learned that she would receive another low rating of 4. [Docket No. 29-16, 2014 Mid-Year Review Notes]. Ms. Brown explained that Ms. Palmer's projected rating was based on her continued failure to meet deadlines. *Id.*. She further stated that Ms. Palmer's deficiencies with paperwork and data entry persisted, and that her prioritization of projects still needed work. *Id.*

At the end of the year, Ms. Palmer received an Overall Rating of 3. [Docket No. 29-17, 2014 Performance Development Workbook]. Ms. Brown stated that Ms. Palmer "needed to continue working on setting priorities for her assignments" and "keep focus on what is being asked of her and not try to delve into something that isn't necessary." [*Id.*].

E.    **2015**

On Friday, September 25, 2015, Ms. Palmer slipped and fell while wearing flip flops at work. [Docket No. 29-6, p. 172-173]. She was treated at the scene by Monica Bush, a nurse from MPC's employee health department who determined that she did not require further treatment but advised her to contact the on-call nurse if her condition worsened over the weekend. *Id.* Otherwise, she could simply return to MPC's health department for a follow-up examination on Monday. *Id.* According to Ms. Palmer, she sought treatment at a MedExpress over the weekend. She alleges that Ms. Brown reprimanded her for seeking outside treatment. *Id.* at p. 65. Ms. Palmer filed a workers' compensation claim shortly thereafter. *Id.* at p. 210.

Following the accident, Mr. Smith updated the dress code to include a ban on flip-flops,

sandals, and other open-toed footwear. *Id.* at p. 181-182. Despite Ms. Palmer's previous slip and fall wearing flip-flops, she violated the new flip-flop ban twice in the month following its introduction. *Id.* at p. 182 -184.

Ms. Palmer maintains that after she returned to work on October 1, 2015, the excessive criticism of her performance began. She testified that her workload became heavier. [Docket No. 31-2]. She also claims that Ms. Smith asked her about Ms. Palmer's seeking legal representation for her workers' compensation claim. *Id.* Ms. Smith denies making any comments in this regard. [Docket No. 29-7].

The next item in the chronology is a discussion between Ms. Brown and Ms. Palmer on October 13, 2015. Ms. Brown asked Ms. Palmer about the status a particular project. [Docket No. 29-6, p. 64]. Ms. Palmer testified that Ms. Brown told her, in a raised voice, to get the project done "or else." *Id.* Ms. Palmer documented this exchange in an email that she sent to herself using her work email account. [Docket No. 29-20]. Ms. Palmer also reported this incident to Mr. Smith. [Docket No. 29-6, p. 710].

Three days later, Mr. Smith called a meeting with Ms. Palmer and Ms. Brown to discuss the aforementioned incident. *Id.* According to Ms. Palmer, Ms. Brown told her, "If you're calling me out, I'm calling you out. You wait and see." *Id.* Ms. Palmer first testified that she believed this to be a threat pertaining to her performance review. *Id.* But she later testified that she did not know what Ms. Brown meant when she said she would "call her out." [Docket No. 29-22, p. 30].

Around the same time, Ms. Palmer submitted a note from her psychiatrist, Dr. Nika Razivapour, to Mr. Smith. The note stated:

7

> To whom it may concern,
> Due to April's attention deficit disorder, she does have trouble
> managing her time and finishing tasks. Any available training or
> help with work or longer time to finish projects would be very
> helpful to reduce her stress and improve her performance.

[Docket No. 29-23].

On December 29, 2015, MPC received a note from Ms. Palmer's neurologist, Dr. Ronald Barebo, stating that she had "complex medical issues" and "may need flexibility in her schedule while undergoing [further] evaluation." [Docket No. 29-24].

Two days later, Ms. Palmer submitted two more medical notes to MPC, one from Dr. Razivapour, the other from Sheree Overfelt, a therapist. [Docket No. 29-25]. Both notes included a series of suggested accommodations for Ms. Palmer. *Id.* Dr. Razivapour recommended that MPC allow Ms. Palmer flexible work hours and ample time to complete tasks that do not require more than 40 hours per week, explain clear expectations of her responsibilities, assign a new project only after she has finished one, provide specialized training for time management and multitasking, allow the use of a recorder or Dragon software, and allow a work schedule to accommodate her treatment of Crohn's. *Id.* Similarly, Ms. Overfelt suggested that MPC present instructions in both written and oral format, allow digital recording, permit extended time for training, reduce distractions in her work space, clearly define job requirements, offer the use of computer technology for written work such as One Note and Dragon Speak, allow set times during the work day to organize her work space, and provide written or verbal reminders for meetings. *Id.*

8

Mr. Smith acknowledged receipt of both notes and stated that he would need time to evaluate the accommodation requests listed therein. [Docket No. 29-5]. He also noted that he had already authorized Ms. Palmer to attend a time management course that fit the criteria. *Id.*

**F.  2016**

On January 18, 2016, Marine Medical received an FMLA Certification form from Ms. Palmer's internist, Dr. Kevin Yingling, dated August 24, 2015, request for intermittent FMLA based on Ms. Palmer's Crohn's disease. [Docket No. 29-26]. MPC designated intermittent leave taken between August 25, 2015 and February 24, 2016, as FMLA-protected. *Id.* MPC processed another intermittent leave request on Ms. Palmer's behalf based on Dr. Barebo's December 2015 note. [Docket No. 29-27]. Dr. Barebo completed and submitted a Certification form supporting the leave request, but MPC requested additional clarification from him. *Id.*

While on leave, on January 19, 2016, while Ms. Palmer was saw therapist William Webb. He wrote a note to MPC stating that Ms. Palmer suffered from chronic pain and that her "current pain level has rendered her temporally unable to perform any type of work or physical activity." Upon receiving this note, MPC asked for more information from Dr. Webb [Docket No. 29-28].

Ms. Palmer attempted to return to work on February 2, 2016. However, Mr. Smith sent her home becausehe had not yet received the requested clarification. [Docket No. 29-29].

A week later, Dr. Webb completed a Return to Work note, indicating that Ms. Palmer could return to an "unrestricted trial to full-time work." [Docket No. 28-28]. Ms. Palmer returned to work on that day, but MPC again requested clarification on Dr. Webb's second note. *Id.*

Ms. Palmer asserts that Ms. Brown accused her of trying to use her medical issues as a

9

excuse for her subpar job performance and [Docket No. 29-6, p. 215]. Ms. Brown denies any such exchange. [Docket No. 29-7].

Ms. Palmer's next performance review was, once again, not positive. Ms. Brown noted that Ms. Palmer "still needs to focus on time management," observing that "[h]er work assignments are fewer this year but I don't see her using the extra time efficiently." [Docket No. 29-30]. Ms. Brown suggested that Ms. Palmer improve her time management skills by "focus[ing] more on getting results and spend less energy on complaining about deadlines being difficult even after deadlines were pushed back" and "spend[ing] less time on non-core tasks such as the shoe drive or optional meetings." *Id.* She then recommended that Ms. Palmer "quit spending time chatting with co-workers about non-work related items if she is having problems meeting deadlines." *Id.* Office cleanliness and timely submission of leave documentation were identified as further areas for improvement. *Id.* Because Ms. Palmer received the lowest performance rating, based mostly on behaviors that she had struggled with throughout her time with MPC, she was told that she would be placed on the 90-day Performance Improvement Program ("PIP"). *Id.*

Notably, MPC had yet to receive the requested clarification from Dr. Webb. In an effort to obtain further information with regard to Ms. Palmer's medical conditions and as permitted by the FMLA, MPC scheduled an independent medical exam ("IME") with Dr. Peter Boxer. *Id.* In the interim, however, Ms. Palmer was granted continuous leave beginning February 15 until released to work by Dr. Boxer or until leave was exhausted. [Docket No. 29-32].

Ms. Palmer attended the IME on February 19, 2016. [Docket No. 29-33]. Three days later, Dr. Boxer submitted his findings to MPC . He released Ms. Palmer to return to work with

10

the following suggested accommodations: give her verbal instructions regarding all responsibilities/assignments, to be followed by specific written instructions as soon as possible; provide her with a portable electronic organizer; provide her with time and project management training; provide her with as quiet a work environment as possible; and assist her with finding an ADHD coach. *Id.* Based on his report, MPC denied the leave requests initiated in connection with the incomplete forms submitted by Dr. Barebo and Dr. Webb.

However, MPC approved yet another FMLA leave request in connection with her Crohn's disease, thereby designating intermittent leave taken through August 24, 2016, as FMLA-protected. [Docket no. 29-34].

Meanwhile, MPC took steps to implement Dr. Boxer's suggested accommodations. In addition to the PIP, which articulated specific goals, set precise deadlines, and contemplated regular progress meetings with her supervisors, Ms. Palmer had a company-issued laptop with calendar and task management applications, a private office with a door, and Mr. Smith's permission to attend a one-day time management seminar at company expense. *Id.* MPC also offered to finance sessions with an ADHD coach through its Employee Assistance Program ("EAP)"). [Docket No. 29-46]. Although Ms. Palmer indicated that she was interested in this option, she repeatedly failed to respond emails regarding scheduling these sessions. *Id.*

MPC contacted Dr. Boxer about its efforts in order to ensure that they were consistent with his recommendations and sufficient to meet Ms. Palmer's needs. *Id.* Dr. Boxer answered in the affirmative. *Id.*

Mr. Smith and Ms. Brown met with Ms. Palmer in early March 2016 to implement her 90-day PIP, which would run from March 3 through June 3. They explained the purpose of the

11

PIP and the consequences of failure to meet the goals set forth therein, namely, termination.

Two days later, Ms. Palmer filed a complaint against Mr. Smith and Ms. Brown to MPC's Business Integrity & Compliance Office ("BI&C"). [Docket No. 29-39]. Ms. Palmer alleged that Mr. Smith and Ms. Brown retaliated against her for filing a workers' compensation claim, as well as seeking FMLA leave and accommodations. *Id.* BI&C investigated the claim, but found it to be unsubstantiated. *Id.*

For the next three months, despite being placed on PIP and notwithstanding the accommodations afforded her, the record reveals that Ms. Palmer's performance was erratic. While Ms. Brown occasionally noted improvements such as "April is doing much better on reporting when she is going to be off of work or will be late as of 3/30/2016" and "April's office cleanliness is better but still needs improvement," most of her comments reflected now-familiar concerns about time management, project prioritization, and organization. *Id.* For instance, Ms. Brown wrote:

> I see no improvement in how April is handling her tasks. There has been a constant issue of her sending emails and waiting on responses and therefore little or no work is getting done. This is reflected in her weekly notes.

[Docket No. 29-37].

In May 2016, Ms. Palmer accessed her PIP's "meta-data" and learned that Ms. Brown had first created it in late October 2015. [Docket No. 29-22, p. 43-36]. This discovery prompted her to file another complaint with BI&C, again accusing Mr. Smith and Ms. Brown of retaliation. *Id.* She also contacted MPC's Integrity Hotline. *Id.*

In June, Ms. Palmer submitted another intermittent FMLA leave request, supported by a

12

Certification from her infectious disease specialist, Dr. Thomas Rushton, who indicated that such leave was needed for her Chronic Fatigue Syndrome ("CFS"). [Docket No. 29-40]. On June 2, 2016, MPC requested that Dr. Rushton provide clarification with regard to his request. *Id.*

On June 13, Ms. Palmer contacted Mr. Smith and informed him that her gastroenterologist, Dr. John Eastone, recommended a three week leave of absence. Mr. Smith advised that she would need to use sick leave until MPC received his Certification. [Docket No. 29-41].

MPC later denied her request for intermittent leave based on CFS because it did not receive the requested clarification from Dr. Rushton, but approved her continuous leave request based on Dr. Eastone's certification. [Docket No. 29-42]. Accordingly, Ms. Palmer's leave from June 10 through July 5 was designated as FMLA protected leave. *Id.*

Ms. Palmer's PIP expired just before she took leave. Her supervisors felt that she had demonstrated little, if any, improvement in the areas identified in the PIP. *Id.* As such, they believed termination of her employment was appropriate. Nevertheless, MPC decided that termination would be postponed until Ms. Palmer finished her FMLA leave.

Accordingly, when Ms. Palmer returned to work on July 5, 2016, she was immediately directed to meet with Mr. Smith and Ms. Brown, who informed her that her employment with MPC was terminated for failure to meet the expectations in the PIP.

Ms. Palmer filed two Charges of Discrimination against MPC with the Equal Employment Opportunity Commission ("EEOC") alleging that MPC discriminated against her on the basis of age and disability. [Docket No. 29-43]. The EEOC dismissed both charges.

## G. Procedural History

13

Ms. Palmer filed this lawsuit in Boyd Circuit Court against MPC, alleging violations of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act ("FMLA").

MPC removed the matter to this Court. MPC now seeks summary judgment as to all claims alleged against it.

## II.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (*quoting* Fed. R. Civ. P. 56(e) ). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that

14

there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. *Id.* Rather, credibility determinations must be left to the fact-finder. Id. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Id.* at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, the court will rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits properly submitted. Fed. R. Civ. P. 56( c ).

## III.

Plaintiff maintains that the termination of her employment was in violation of the ADA

15

and the FMLA.[1] The Court will address each argument in turn.

**A. ADA**

The ADA prohibits covered employers [2] from discriminating against employees based upon their disability. Among other things, the ADA defines "disability" as a "physical or mental impairment that substantially limits one or more...major life activities," 42 U.S.C. § 12102(A) or as "being regarded as having such an impairment." § 12102( C) .

There appears to be no dispute that Ms. Palmer was disabled or considered to be disabled. Although Ms. Palmer conflates her arguments, she appears to advance four theories of discrimination based upon her disability: disparate treatment, retaliation, failure to accommodate, and hostile work environment.

i. Disparate Treatment

"Disparate treatment is the most easily understood type of discrimination. The employer simply treats an employee less favorably than others because of the employee's race, color, religion, sex, or [disability]." *Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977). *See*

---

[1] In her response to MPC's dispositive motion, Plaintiff makes no argument in support of her claims for age discrimination and FMLA interference. As such, these claims are deemed abandoned. *See, e.g., Clark v. City of Dublin, Ohio,* 178 Fed.Appx. 522, 524–25 (6th Cir.2006) (finding that, when a plaintiff did not properly respond to arguments asserted by a defendant's motion for summary judgment as to two claims, "the District Court did not err when it found that the Appellant abandoned [those] claims"); *Conner v. Hardee's Food Sys., Inc.,* 65 Fed.Appx. 19 (6th Cir.2003) (finding that the plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue before the district court"); *Parker v. Zale Corp.,* 864 F.Supp.2d 670, 684–85 (E.D.Tenn.2012) (finding that defendants are entitled to summary judgment as to claims that plaintiff abandons at the summary judgment stage); *Anglers of the Au Sable v. United States Forest Svc.*, 565 F.Supp.2d 812, 839 (E.D.Mich.2008) ("It is well settled that abandonment may occur where a party asserts a claim in its complaint).

[2] Neither party disputes that MPC is covered by the ADA.

16

*also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) . Liability in a disparate-treatment case "depends on whether the protected trait actually motivated the employer's decision." *Id.*

Disparate treatment can be proven by either direct or circumstantial evidence. So-called smoking-gun evidence is rare in cases involving workplace discrimination and is absent in this case. Therefore, Ms. Palmer must construct a circumstantial case, which invokes the three-part protocol articulated *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the *McDonnell Douglas* analysis, a plaintiff must first make out a *prima facie* case of discrimination. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir.2001). She bears the burden of demonstrating the following five elements: (1) she has a disability; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) [MPC] knew or had reason to know of his or her disability; and (5) she was replaced by someone outside the protected class or the position remained open. *Williams v. AT & T*, 639 F.3d 253, 259 (6th 2011). "The burden then shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for [the adverse action]." *Skrjanc*, 272 F.3d at 315. If the defendant states such a reason, the plaintiff then has the burden of showing that the defendant's articulated reason is a pretext for discrimination. *Id.*

Ms. Palmer testified about comments that Ms. Brown allegedly made about her ADHD. For example, when Ms. Brown relayed Ms. Palmer's 2014 request for a time management course to Mr. Smith, she allegedly stated, "Wait until you hear this. She says she has ADHD, whatever that is." [Docket No. 29-6, p.52- 53]. Ms. Palmer also alleges that Ms. Brown stated that she was "trying to make a medical issue out of her performance" during their 2015 review meeting. *Id.* at p. 100. Ms.

17

Palmer further testified to an occasion where she expressed a need for assistance, and Ms. Brown told her that she would just have to adjust, but could not recall when Ms. Brown made this statement. *Id.* at p. 214. Of these three isolated remarks, the first is the only one that clearly pertains to her disabilities it does not appear to express discriminatory animus. The comment, while insensitive, appears to be benign, given the undisputed fact that MPC took substantial steps to accommodate her ADHD.

As the remainder of the *McDonnell Douglas* analysis pertains to Ms. Palmer's claim of retaliation, the Court will address MPC's reason for terminating her employment and Plaintiff's attempt to establish pretext *infra*.

### ii. Retaliation

As part of her ADA claim, Ms. Palmer contends that MPC retaliated against her for requesting accommodations.

To establish a *prima facie* case of retaliation, Ms. Palmer must show that: (1) she engaged in protected activity under the ADA; (2) MPC knew of this exercise of protected rights; (3) MPC subsequently took an employment action adverse to her or subjected her to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.*

In support of her claim, Ms. Palmer states that Ms. Brown was hostile toward her in 2015, gave her a poor performance rating, and created her PIP. Yet, the evidence reveals that Ms. Palmer's initial accommodation requests occurred at some point in 2014, more than a year before these instances occurred. Thereafter, as Ms. Palmer points out, Ms. Brown allegedly became hostile toward her and created her PIP in October 2015. But the PIP was created before

18

she began requesting accommodations in December 2015 and January 2016. This undisputed sequence of events simply fails to support any casual connection between Ms. Palmer's request for accommodations and any adverse action as a matter of law.

Interestingly, Ms. Palmer make no argument whatsoever with regard to her *prima facie* burden, stating, rather boldly, "there is no question that Palmer establishes a *prima facie* case of discrimination and/or retaliation." [Docket No. 31, p.8]. Even if one were to regard Ms. Palmer's evidence as adequate to present a *prima facie* case of discrimination, the Court's analysis is far from over. The ball moves to MPC's court. MPC argues that it had a legitimate, non-discriminatory reason to terminate Ms. Palmer, to-wit, her increasingly poor work performance. The Court agrees. The record is replete with evidence in this regard.

The burden now rests upon Ms. Palmer to establish pretext. This final stage of the *McDonnell Douglas* inquiry is more often than not the battleground for the parties. As the burden of persuasion is upon plaintiff, she must, at this juncture, dissect the mind of her employer and uncover unspoken opinions which are indicative of discriminatory animus. This is a difficult row to hoe.

"Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir.2012) (*quoting Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir.2009)). The Court notes that these categories are not the only inquiruies. Rather, they offer a way of marshaling evidence and focusing it on the ultimate inquiry: "did the employer fire the employee for the stated reason or

19

not?" *Id.* As we have stated, "at bottom the question is always whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.*

In her response to MPC's dispositive motion, Plaintiff makes four arguments in an attempt to show pretext and cross the summary judgment hurdle.

First, she maintains that her poor performance has no basis in fact because she showed Ms. Brown that one of the issues identified in her 2013 performance review was actually caused by the temporary employee who held her position while she was on medical leave. This allegation falls far short of establishing pretext. Her cry of "someone else did it" is unsubstantiated by the record as Mr. Palmer has not produced the documents that allegedly verify her claim. Even if such evidence existed in the record, it is not relevant; rather it is " stale because [Ms. Palmer's] performance or [MPC's] expectations may have legitimately changed since the prior review period." *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 452-53 (6th Cir. 2011) (citing *Strickland v. FedEx Corp.*, 45 F. App'x 421, 424 (6th Cir. 2002) (rejecting the use of prior performance reviews because they did not establish that the plaintiff was "qualified at the time of her termination")). Finally, a single incident is merely a blip in Ms. Palmer's history of poor performance. Ms. Palmer's annual performance reviews are rife with comments about her disorganization, inadequate communication, inability to prioritize assignments, deficient time management skills, and an overall lack of sound judgment. These reviews further reflect that Ms. Palmer's issues worsened, rather than improved, over the course of her career at MPC, despite its efforts to assist her. Thus, her argument does not undermine the factual basis for MPC's ultimate decision.

Ms. Palmer's second attempt to establish pretext is, in a few words, " if I was so bad they

20

should have terminated me long before this."   She argues that MPC would not have tolerated her

for so long if her performance had truly been deficient.  This overly simplified argument ignores

the function and purpose of MPC's performance management system and processes, which are in

place to help employees succeed at the company.  When Ms. Palmer's reviews were not

favorable, MPC used the mechanisms it hasd, such as PIP, to help and encourage her to improve.

Similarly, Ms. Palmer asserts that her poor performance did not actually motivate the

termination decision because MPC did not tell her that she was terminated for poor performance.

Ms. Palmer's purported ignorance of the reason for her termination is implausible, given her

placement on the PIP, which expressly indicates that non-compliance may result in termination

Moreover, nothing in the record suggests that MPC was required to state, again and again, the

reason for her termination.

Finally, Ms. Palmer concludes that "[w]hen job performance criticisms and PIPs follow

immediately after workplace injuries and employee reports of misconduct, surely the temporal

connection implies pretext."  Yet, she stops there, with no evidence.

A case alleging unlawful discrimination and/or retaliation is not a vehicle for litigating

the accuracy of the employer's grounds for termination.   Ms. Palmer's  bare assertion that MPC's

proffered reason for terminating her employment has no basis in fact is not enough to establish

pretext.  Instead, she must offer some evidence that discrimination and/or retaliation was the real

reason for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515  (1993) (stating

that "a reason cannot be proved to be 'a pretext for discrimination unless it is shown both that the

reason was false, and that discrimination was the real reason).  To defeat a summary judgment

motion in such circumstances, the "plaintiff must produce sufficient evidence from which the

jury could reasonably reject the defendant's explanation and infer that the defendants acted with discriminatory animus. *Braithwate v. Tinken Co.*, 258 F.3d 488, 494 (6th Cir.).

Ms. Palmer has given this Court only theories and speculation, neither of which is sufficient to establish pretext.

### iii.   Failure to Accommodate

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee...." 42 U.S.C.§ 12112(b)(5)(A). To prove a failure-to-accommodate claim under the ADA, a plaintiff must show that she has a disability, that she is otherwise qualified for his position, and that the defendant refused to make a reasonable accommodation. *Stefanski v. W.W. Grainger, Inc.*, 155 Fed.Appx. 177, 2005 WL 2572369 (citations omitted).

Crucial to a plaintiff's claim in this regard is proving that she requested a reasonable accommodation. *See Tubbs v. Formica Corp.*, 107 Fed.Appx. 485, 488 (6th Cir.2004) (*citing Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633-34 (6th Cir.1998)). A plaintiff must not only demonstrate the requested accommodation was reasonable but also that any offered alternatives were inadequate. *Trepka v. Board of Education*, 28 Fed. Appx. 455, 459 (6th Cir. 2002).

Ms. Palmer identified the following requests for accommodation: (1) asking Mr. Smith about her performance and whether she needed to do anything prior to her surgery in 2013; (2) requesting permission to attend a time management course in 2014; (3) submitting a note from Dr. Razivapour in September 2014; (4) submitting a note from Dr. Razivapour in late 2015; (5) submitting a note from Ms. Overfelt in late 2015; (6) requesting permission to attend a time management course in late 2015; and (7) submitting a note from Dr. Razivapour in early 2016.

The 2013 conversation does not appear to be a request for accommodation under the ADA. Ms. Palmer did not actually ask Mr. Smith to change anything about her work schedule, duties, or environment. Similarly, although, Ms. Palmer submitted a note written by Dr. Razivapour in September 2014, she was unable to testify if it contained specific items that she needed to manage her ADHD. These two instances cannot objectively be considered requests for accommodation.

With regard to her request for permission to attend a time management course in 2014, Ms. Palmer explained that she had found two courses and that she ultimately attended one along with MPC administrative professionals and nursing staff. [Docket No. 26-6, p. 56]. However, Ms. Palmer testified that this course was not advanced enough for her. *Id.* Yet, her opinion about the course does not obviate the fact that she asked to attend a course and MPC granted her request.

Ms. Palmer also takes issue with Mr. Smith's handling of her 2015 request for permission to attend a time management course. While she acknowledged that he granted her request, she complained that she could not find a course within the parameters that he set. Again, this does not change the fact that he granted her request. Moreover, she offers no proof that the parameters were unreasonable or inadequate.

As for Dr. Razivapour's 2015 note, Mr. Smith considered the accommodations but concluded that requests for "more help" and "additional time" were vague and unreasonable on their face, given the limited personnel in the Training Department and the essential functions of Ms. Palmer's position. Nevertheless, Mr. Smith indicated that Ms. Palmer could request additional assistance or extended deadlines on an as-needed, case-by-case basis. Many of the

accommodations relating to her ability to work from home and record information simply were not doable given her job description. [Docket No. 29-5, Affidavit of Chet Smith]. Training Specialists are required to meet regularly with their client groups on-site. *Id.* These meetings may involve sensitive business information that MPC does not wish to have preserved in recorded form. *Id.* Even so, before Mr. Smith made a final decision about these suggested accommodations, Ms. Palmer submitted additional FMLA accommodation and leave requests for other medical conditions/issues that ultimately led to her IME. Dr. Boxer's report included a list of similar accommodations, many of which MPC implemented in short order, thereby obviating the need for further consideration of the previous lists.

A review of the evidence proffered by both parties demonstrates that MPC did not fail to accommodate Ms. Palmer's ADHD. Although Ms. Palmer maintains that MPC did not accommodate her condition in the manner that she preferred, this is not the standard. ADA accommodations are subject to reasonableness, not employee preferences. *See Trepka*, 28 Fed. Appx. at 459.

Therefore, her claim fails.

iv. Hostile Work Environment

The Sixth Circuit recognizes ADA hostile work environment claims. In determining whether there was a hostile or abusive work environment, the court looks to the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). In particular, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id. (quoting Harris v. Forklift*

24

*Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Accordingly, harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment to create an abusive working environment." *Broska v. Henderson,* 70 Fed.Appx. 262 (6th Cir. June 30, 2003) (*citing Harris*, 510 U.S. at 21). Moreover, the inquiry as to the degree of hostility "has both an objective and subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive." *Id.*

Finally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher, supra.*

Ms. Palmer alleges that "on or about October 13, 2015, Ms. Brown began making angry outbursts toward plaintiff and otherwise created a hostile work environment." [Complaint, Docket No. 1]. Ms. Palmer testified that on that day, Ms. Brown asked her about a specific project to which she was assigned. [Docket No. 29-6, p. 65]. She describes Ms. Brown as "hateful," "stern," and "slammed her fist down on the desk." *Id.*. She characterized their exchange on October 16 as another "angry outburst." *Id.* at 69 -72]. MPC characterizes these instances Ms. Brown addressing and criticizing Ms. Palmer's work performance, which is a part of her job. *See Hill v. Nicholson*, 383 F. App'x 503, 511 (6th Cir. 2010) (finding that no reasonable jury could conclude that the plaintiff was subject to a hostile work environment, "given that most of [the supervisor's] actions involved mere work-related criticisms . . . " in the Title VII context).

When asked to identify any other instances that contributed to the alleged hostile work

25

environment, Ms. Palmer referred to an incident where she tried to work in a conference room to be closer to the bathroom because she was having a flare-up, and Ms. Brown told her to return to her office because she was creating a disturbance. [Docket No. 29-6, p 72]. Ms. Brown also allegedly reprimanded her for her use of Learning Services to troubleshoot a computer issue. *Id.*

Taking the facts alleged in the light most favorable to plaintiff, the Court finds that these comments do not rise to the level of hostility required; they are in no way severe or pervasive enough to alter the conditions of Ms. Palmer's employment. Any argument to the contrary strains the bounds of credibility.

**B. FMLA**

The FMLA entitles eligible employees up to twelve weeks of unpaid, job-protected leave per year. 29 U.S.C. § 2612(a)(1). Employees may use this leave to recover from a serious health condition or to care for an immediate family member with a serious health condition. Id. The Act prohibits employers from retaliating against employees who take such leave, or otherwise interfering with their right to do so. *Id.* § 2615(a); *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Ms. Palmer alleges that MPC retaliated against her for taking FMLA leave.

In analyzing a claim for retaliation within an FMLA context, the court applies the familiar burden-shifting *McDonnell Douglas* rubric, discussed *supra*. She can establish a prima facie case of discrimination by showing that (1) she availed herself of a protected right under the FMLA by notifying MPC of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. If she satisfies these three requirements,

26

the burden shifts to MPC to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *Skrjanc*, 272 F.3d at 315. Then she can offer evidence of pretext. *Id.*

Ms. Palmer's claim for FMLA retaliation fares no better than her ADA retaliation claim. Ms. Palmer identifies her 2015 performance review, her PIP placement, and her termination as adverse employment actions. Her performance review and PIP are not "adverse employment actions" because neither "materially altered the terms and conditions of her employment." *See generally, Spees v. James Marine*, 617 F.3d 380 (6th Cir. 2010).

As for her termination, Ms. Palmers gains some traction by emphasizing the timing of her FMLA leave, from January to June 2016, and her termination in July. However, the chronology does not negate MPC's legitimate, nondiscriminatory reason for letting her go.

Again, Ms. Palmer fails to successfully establish pretext. Her own testimony belies her contention that MPC's motives were retaliatory. During her deposition, Ms. Palmer was asked by MPC's counsel to explain why she believed MPC retaliated against her:

> Q: So you were told that it just wasn't going to work out or something along those lines, but why do you believe that your employment was terminated?
> A: I believe my – I was terminated inappropriately. For various reasons. Basically I believe I was retaliated against and discriminated against for my disabilities. And for requesting accommodations.
> Q: Okay. You believe your job was terminated because you were retaliated against and discriminated against on the basis of disabilities and for requesting accommodations?
> A: Well, yes, I believe it was – I believe it was multiply motivated, yes.
> Q: Okay. Multiply motivated for reasons other than those you've just listed?
> A: There was a series of protected activities that I had engaged in. I

27

had filed a workers' comp claim. I had asked for accommodation.
Those accommodations were refused. I requested and tried to enact
FMLA. The retaliation – I believe that the performance evaluation
and the PIP were retaliatory.
Q: Anything else?
A: No. I believe I was wrongfully terminated.

[Docket No. 29-6, pp. 42-47].

Ms. Palmer's circular reasoning falls far from establishing issues of material fact
regarding MPC's true motivation for terminating her employment.

## C. Workers' Compensation

Ms. Palmer's alleges that MPC retaliated against her for pursuing a Workers'
Compensation claim in connection with the September 2015 fall she suffered at work.
Yet, she did not cite the workers' compensation retaliation statute in her Complaint, nor did she
allege she had pursued a claim for workers' compensation benefits.   Regardless of her reliance
on what appears to be an unpled cause of action,  she has waived her right to assert such a claim.
Ms. Palmer and MPC executed a Full and Final Settlement Agreement and Release relating to
her workers' compensation claim, a copy of which is in the record at Docket No. 43-1.  Ms.
Palmer explicitly agreed to "acquit and forever discharge . . . [MPC] . . . from all claims,
demands, damages, motions, causes of action, and suits at law or equity, that [she] now has or
hereafter may have, whether known or unknown, heretofore or hereafter arising in any way out of
the workers' compensation claim identified above." *Id.* . Ms. Palmer's workers' compensation
retaliation claim definitely arises out of her workers' compensation claim, as she would not be
able to assert the former without having first pursued the latter. The Agreement effectively bars
Ms. Palmer's putative claim for workers' compensation retaliation. *See, e.g., Waddle v. Galen of*

28

*Ky., Inc.*, 131 S.W.3d 361, 364-65 (Ky. Ct. App. 2004) (explaining that releases supported by valuable consideration are valid and enforceable).

## IV.

Although Ms. Palmer insists Ms. Brown and, to some extent, Mr. Smith, had a proverbial axe to grind with her, she offers no evidence that either discriminated against her because of her disability or her use of FMLA leave. A plaintiff facing a summary judgment motion cannot "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). Ms. Palmer has failed to make such a showing in this case.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Marathon Petroleum Company, LP's Motion for Summary Judgment [Docket No. 28] be **SUSTAINED**.

This ___ day of October, 2018.